1 | **W. DOZORSKY, J.D., ESQ.**
2 | 2152 Dupont Drive
2 | Suite 214-A
3 | Irvine, CA  92612
3 | Tel.: [949] 673-3894
4 | California State Bar #98515

5
6 | Attorney for plaintiffs

7

8 | **UNITED STATES DISTRICT COURT**

9 | **CENTRAL DISTRICT OF CALIFORNIA**

10

11 | LIBERATO DE LUMEN, individual,)  **CASE NO.** SACV11 - 699 DCC(AN)
FATIMA DE LUMEN, individual, )
12 |                 Plaintiffs, )   **COMPLAINT FOR**
                                )   **1) DAMAGES FOR NEGLIGENT**
13 |      v.                     )   **AND RECKLESS**
                                )   **MISREPRESENTATIONS;**
14 | ONE WEST BANK, FSB, as       )   **2) DAMAGES FOR**
successor in interest           )   **CONSTRUCTIVE FRAUD;**
15 | to INDYMAC FEDERAL BANK FSB; )   **3) DAMAGES FOR**
FEDERAL DEPOSIT INSURANCE        )   **UNCONSCIONABILITY,**
16 | CORPORATION;                 )   **UNJUST ENRICHMENT,**
MORTGAGE ELECTRONIC             )   **AND FOR VIOLATION**
17 | REGISTRATION SYSTEMS, INC.,  )   **OF COVENANT OF GOOD FAITH**
a corporation;                  )   **AND FAIR DEALING;**
18 | McCABE, WEISBERG & CONWAY, LLC)  **4) FOR ACCOUNTING;**
limited liability company;      )   **5) DECLARATORY RELIEF;**
19 | DEUTSCHE BANK NATIONAL TRUST )   **6) DAMAGES AND RELIEF**
COMPANY, business organization) **FOR VIOLATION OF FEDERAL**
20 | ALL  PERSONS  UNKNOWN  CLAIMING) **RACKETEERING AND CORRUPT**
ANY LEGAL OR EQUITABLE RIGHT, ) **ORGANIZATIONS ACT ["RICO"]**
21 | TITLE, OR OTHER INTEREST IN  )
THE REAL PROPERTY COMMONLY      )   **TRIAL BY JURY IS DEMANDED**
22 | KNOWN AS                     )
11060 BERRYPICK LANE;           )
23 | COLUMBIA, MARYLAND 21044,    )
                                )
24 |                             )
                                )
25 |              Defendants.    )
                                )
26 | —————————————————————————————)
                                )
27 |                             )
                                )
28

The plaintiffs LIBERATO DE LUMEN and FATIMA DE LUMEN, individuals, complaining as to the defendants, and each of them, allege as follows:

1.    The plaintiffs are residents of the state of California, prosecuting this lawsuit concerning real property commonly known as 11060 Berrypick Lane; Columbia, MD 21044, hereafter "property", the legal description of which is: BEING KNOWN AND DESIGNATED AS LOT NO. 29A AS SHOWN ON A PLAT ENTITLED. "STRATHMORE AT COLUMBIA, PART 3, VILLAGE OF HARPERS CHOICE, SECTION 3, AREA 3, RESUBDIVISION OF LOT 1", WHICH PLAT IS RECORDED AMONG THE LAND RECORDS OF HOWARD COUNTY, MARYLAND IN PLAT BOOK NO. 17, FOLIO 85.

2.    Federal court jurisdiction exists pursuant to title 18, United States Code, §§1961 et seq., Racketeer Influenced and Corrupt Organizations Act ["RICO"] of title 18, United States Code. Federal court jurisdiction also exists because defendant FEDERAL DEPOSIT INSURANCE COPORATION is being sued, as on information and belief, the party which retains liabilities regarding any actions by defendant INDYMAC FEDERAL BANK, FSB, done by and through its employees, agents and representatives.

3.     Defendants MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., a corporation; McCABE, WEISBERG & CONWAY, LLC limited liability company; DEUTSCHE BANK NATIONAL TRUST COMPANY, business organization, are business organizations and/or corporations doing business worldwide, including the state of California.

4.     Defendant ONE WEST BANK, FSB, is a banking entity which became successor in interest to defendant INDYMAC FEDERAL BANK, which acquired loan interest regarding plaintiffs' property from Federal Savings Bank, subsequent to the loans involved in this action. Defendants, and each of them, were involved in origination, and/or servicing, and/or collection of monetary payments and and/or enforcement of mortgage interests against the plaintiff, as to Loan No. 4000247671 for $224,000. Plaintiffs are informed and believe that defendants DEUTSCHE BANK NATIONAL TRUST COMPANY and McCABE, WEISBERG & CONWAY LLC are current investors, _partial_ owners of the loan promissory note among many unnamed other owners of said note.

5.     All of the hereinabove named defendants, including ALL PERSONS UNKNOWN CLAIMING ANY LEGAL OR EQUITABLE RIGHT, TITLE, OR OTHER INTEREST IN THE REAL PROPERTY COMMONLY KNOWN AS 11060 BERRYPICK LANE; COLUMBIA, MARYLAND 21044, hereafter collectively designated "defendants", and each of them, are in some manner legally liable for the relief sought through this complaint, as more specifically stated and alleged below.

6.    The plaintiffs are individuals who are not greatly experienced in decision making, underwriting policies and lending policies in real estate transactions.   Defendants, and each of them, by contrast are very experienced in real estate marketing, sales and lending strategies. Throughout the interaction between plaintiffs and the defendants, and each of them, as set forth in details below, the defendants knew or had reason to know that plaintiffs could not afford to pay the amount eventually to be charged on the currently operative adjustable interest rate loan, and that the only way plaintiffs could avoid eventual default and foreclosure sale of the property was to speculate on the ability and availability of further refinancing of the loan. Becasue of this situtation, the terms of the loan contract were such that risk was placed unreasonably and unexpectedly on the plaintiffs in a way overly harsh and one-sided against the plaintiffs, so as to make the loan contract substantively and procedurally unconscionable.

7. Defendants, and each of them, were also aware that the plaintiffs were at a great disadvantage in terms of their knowledge and sophistication about real estate transactions, and that they could not read and understand the complex loan documents which they were being asked to approve and sign. Because of this, those documents were contracts of adhesion, not really bargained for. The loan documents were oppressive, because the plaintiffs had no real negotiations over the loan terms with the defendants, and had no real meaningful choice as to the terms of the loan, which were prolix, complex, in a printed form drafted and/or used exclusively by defendants without input from the plaintiffs, and the plaintiffs became confronted by ambush and surprise with provisions and

practices hidden within prolix printed forms, drafted and/or used and presented to plaintiffs as "take it or leave it" by defendants in the superior bargaining and knowledge position. The plaintiffs were in very poor or none at all bargaining position as to the terms of this latest loan, which made the loan both substantively and procedurally unconsionable, and also unconscionable as contract of adhesion.

8.   Nonetheless, defendants, and each of them, proceeded to make material misrepresentations and false assurances to the plaintiff which defendants knew or had reason to know were materially false and misleading, and/or which defendants made with reckless disregard for the truth. Defendants, and each of them also concealed material facts from the plaintiff and took advantage of the plaintiff's lesser experience in real estate matters so as to amount to constructive fraud upon plaintiff. These named defendants are all jointly and severally liable for relief to the plaintiffs, due to first, usage and liability as respondeat superior as to employees working in the origination of the loan, and subsequently, due to a series of transfers of the mortgage interest against the plaintiffs, so that each defendant is believed to have legally or equitably assumed the liabilities as well as benefits in connection with the mortgage interest, and thus joint and several liability is imputed against all the named defendants.

1   This was done by the defendants, and each of them, as follows,

2       a) by insisting on an adjustable interest rate loan, but

3   misleading the plaintiffs into believing that the loan was for a

4   fixed interest rate;

5       b) by assuring plaintiffs that their property would keep

6   increasing in market value so that they could again refinance it

7   and take a profit by additional equity loan, and the like;

8       c) by employing bait and switch tactic, giving plaintiff

9   a low initial interest rate, with negative loan amortization,

10  so that now the total loan amount balance stands <u>higher</u> than the

11  original loan amount;

12      d) by charging very high points, excessive and unjustified;

13      e) by so fragmenting and "repackaging" plaintiffs' promissory

14  note obligation that the current purported holder of the "right to

15  foreclose" is not a holder in due course for value, and has no

16  standing to proceed with any foreclosure sale against the

17  plaintiffs' interest in the real property involved in this lawsuit;

18      f) by so manipulating terms of the loan contract documents

19  that plaintiffs now face a process of "negative amortization"

20  regarding their debt, so that even if regular monthly mortgage

21  payments are timely made, the overall balance of the debt

22  keeps increasing, while larger payments are penalized, thus

23  ensuring that plaintiffs must eventually lose their property;

24  plaintiffs are informed and believe that the original promissory

25  note and trust deed/mortgage document were acquired by Indymac

26  Bank FSB, transferred to INDYMAC FEDERAL BANK FSB, an affiliate,

27  then put through receivership by FEDERAL DEPOSIT INSURANCE

28  CORPORATION, and sold to defendant ONE WEST BANK FSB;

g) furthermore, plaintiffs are informed and believe and thereon alleges that any involvement by defendant MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., in the chain of title of the promissory note and/or trust deed makes the promissory note unenforceable by any purported current holder(s) or owner(s) thereof, being not original holders or owners but only some of the multiple purported transferees;

h) by perpetrating other statements, concealments, inducements and other acts and omissions to act, concealments, which are not specifically remembered at this time by the plaintiffs but which the plaintiffs allege will be ascertained by depositions and other forms of discovery against defendants, including obtaining "conversation logs" regarding the loan involved here, so that this complaint can be amended accordingly when these are ascertained, and the plaintiff invokes an exception to the stricter standards of factual pleading when it appears,—as here,—that the specific facts lie more within defendant's current knowledge than the plaintiff's, and/or where the facts alleged in the complaint with generality are presumptively within the knowledge or the records of the defendants, or ascertainable by discovery procedures, and/or that less specificity is required where a given defendant must necessarily possess full information concerning the facts of the controversy;

i) by saddling the plaintiffs with adjustable rate promissory note, including balloon payment rider, and adjustable rate rider, concerning the main loan for $224,000, so that plaintiffs could never repay this loan, but instead would have to speculate and rely on ability to refinance.

1

2

3

4

FIRST CAUSE OF ACTION FOR MISREPRESENTATIONS

[Against all defendants]

9.    Plaintiffs reallege in full ¶¶ 1 through 8 of this complaint and incorporate them herein by reference.

10.    Due to the situation alleged in the abovementioned paragraphs of this complaint, paragraphs 6, 7, 8 and subsections thereof, the conduct of defendants, and each of them, constitutes numerous instances of violation of duty of due care, and reckless disregard for the facts and the truth.

Plaintiffs are informed and believes and thereon alleges that all named defendants, including ONE WEST BANK, FSB, as successor in interest to INDYMAC FEDERAL BANK FSB; FEDERAL DEPOSIT INSURANCE CORPORATION, a corporation; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., a corporation; McCABE, WEISBERG & CONWAY, LLC limited liability company; DEUTSCHE BANK NATIONAL TRUST COMPANY, business organization, through their executives and their employees already knew or had reason to know of an impending real estate market crash, this being so, because information about factors predicting this crash was readily available to professional real estate brokers, lenders and the persons or institutions specializing in real estate loans, because it was published. Copies of examples of such written publications are attached as Exhibit #1 and incorporated herein by reference. Despite this available information and the knowledge of it, defendants which originated the loans, specifically defendant INDYMAC, through their employees, made material false representations to plaintiffs, and/or negligently and/or recklessly concealed material facts from plaintiffs which would have influenced plaintiffs' decision.

The situation alleged in the abovementioned paragraphs of this complaint, the conduct of defendants, and each of them, constitutes numerous instances of violation of duty of due care, and reckless disregard for the facts and the truth.

The plaintiffs reasonably relied on the abovementioned, above alleged misrepresentations, having no means to verify truth independently, and would not have entered transactions with any of the defendants, had plaintiffs known the actual full truth.

As a result directly and proximately caused by the abovementioned conduct of the defendants, and each of them, the plaintiffs sustained monetary damages of at least $224,000, or the amount of money that plaintiffs actually paid on the loan, including any downpayment, the exact amount to be determined according to proof at the trial of this action.

SECOND CAUSE OF ACTION FOR CONSTRUCTIVE FRAUD

[Against all named defendants]

11.   Plaintiffs reallege in full ¶¶ 1 through 10 of this complaint and incorporate them herein by reference.

12.   Defendants, and each of them, at all times relevant to this complaint took advantage of plaintiffs and violated duties of good faith, fair dealing, avoidance of unconscionability, and/or fiduciary duties, owed to the plaintiffs, so as to amount to constructive fraud, by the conduct alleged in ¶¶ 1 through 8 of the plaintiffs' complaint.

13.   As a result directly and proximately caused by the tortious conduct of the defendants charged under this cause of action, plaintiffs stand to ultimately lose ownership and possession of the real property, which constitutes damages of at least $224,000, or the amount of money that plaintiffs actually paid on the loan, including any downpayment, whose exact amount shall be determined according to proof.

14.   The abovementioned tortious conduct of defendants, and each of them, specifically the conduct mentioned in ¶¶ 1 through 8, inclusive, of this complaint, was intentional, fraudulent, willful, unlawful, malicious and oppressive; consequently plaintiffs are entitled to punitive damages according to proof at time of trial.

THIRD CAUSE OF ACTION FOR UNCONSCIONABILITY

AND UNJUST ENRICHMENT

[Against all defendants]

15.   Plaintiffs reallege in full ¶¶ 1 through 14 of this complaint and incorporate them herein by reference.

16.   Plaintiffs allege that there exists, implied by law, as to every contract, oral or written, a covenant between the contracting parties of good faith and fair dealing in the process of entering into and performing the given contract. Plaintiffs also allege that there exists a concept of unconscionability of contract, if the terms of a given contract are extremely unfair and harmful as to one of the parties, are unbargained-for terms of adhesion, and/or are oppressive and their effects are not apparent until by surprise, later, because they are hidden in complex printed matter.

Plaintiffs also allege that there exists the concept of equitable remedy for the unjust enrichment of one party at the expense of another party to a contract, including contract for a loan.

17.   Defendant INDYMAC FEDERAL BANK FSB, and all other named defendants, violated an implied covenant of good faith and fair dealing concerning the loan, and the methods used to have the plaintiffs obligate themselves and sign the loan contract documents. Defendant ONE WEST BANK FSB is believed to be successor in interest to defendant INDYMAC FEDERAL BANK, as said defendant passed through receivership by defendant FEDERAL DEPOSIT INSURANCE CORPROATION, which in turn is believed to have assumed liabilities for bad and wrongful loans made by INDYMAC, in turn for a large amount of money paid by ONE WEST BANK to purchase INDYMAC assets. During signing of loan documents, by the way defendants' employees and other officers or rank and file employees acted, no questions by plaintiffs were ever answered, no signed copies were given to plaintiffs. The loan contracts imposed terms that were beyond what the plaintiffs could afford and perform, and the defendants, and each of them, were aware that plaintiffs could not possibly perform. The true intent of the defendants was to deprive plaintiffs of property, make them lose it, and then sell the property to favored and preferred outside buyers.

18.   As a direct and proximate result caused by the abovementioned unconscionability of contract and violation of the implied covenant of good faith and fair dealing, the plaintiffs are entitled to damages amounting to at least $224,000, or the amount of money that plaintiffs actually paid on the loan, including any downpayment the exact amount to be ascertained per proof at time of trial. Furthermore, plaintiffs is entitled to a judgment of the court that the loan contracts are unenforceable on grounds of substantive and/or procedural unconscionability, and also on grounds of unjust enrichment of defendants when they seek to be collectors on this unconscionable loan contract and transaction.

FOURTH CAUSE OF ACTION FOR ACCOUNTING

[Against all defendants]

19.   Plaintiffs reallege in full ¶¶ 1 through 18 of this complaint and incorporate them herein by reference.

20.   Plaintiffs are entitled to a complete and itemized accounting, because of the unmanageable complexity of ascertaining what sums have been paid and to whom they have been applied, during all times relevant.
Plaintiffs are entitled to a complete and itemized accounting, during all times relevant, of the following:

a) all money already received, by any defednant, from the plaintiffs;

b) all assignments, transfers, substitution of parties, on all promissory notes and mortgages and concerning all other documents and instruments mentioning the property involved in this action.

FIFTH CAUSE OF ACTION FOR DECLARATORY RELIEF

[Against all defendants]

21.   Plaintiff realleges in full ¶¶ 1 through 20 of this complaint and incorporates them herein by reference.

22.   An actual controversy has arisen between the plaintiffs and the defendants, and each of them, as follows:

a) Plaintiffs contend that the defendants, and each of them, have generated, processed, transferred and eventually came to possess a promissory note and/or a trust deed as to plaintiffs' property described in ¶ 1 of the complaint by

1) unlawful, fraudulent means,

2) by racketeering and unfair business practices,

3) by such procedural and substantive unconscionability that there exists no defendant and in fact no party in the world who can lawfully enforce the loan contract, so that the entire loan contract with its promissory note and trust deed must be outlawed, adjudged unenforceable, and that plaintiffs should regain unencumbered title to this property or else be fairly compensated with monetary damages.

b) Defendants, and each of them, deny these contentions of plaintiffs and do seek enforcement of the loan contract. To avoid multiplicity of court actions and inconsistent determinations, plaintiffs request that this court declare the respective rights or duties as to each of the parties brought under this civil action, as stemming from allegations in this complaint, and that the court declare and adjudicate that the loan contract, including promissory note and trust deed, are unenforceable against the plaintiffs.

SIXTH CAUSE OF ACTION DAMAGES FOR RACKETEERING ["RICO"]

[Against defendants INDYMAC FEDERAL BANK FSB, ONE WEST BANK FSB, other individual defendants; ALL PERSONS UNKNOWN CLAIMING ANY LEGAL OR EQUITABLE RIGHT, TITLE, OR OTHER INTEREST IN THE REAL PROPERTY COMMONLY KNOWN AS 11060 BERRYPICK LANE; COLUMBIA, MD 21044]

23.  Plaintiffs reallege in full ¶¶ 1 through 22 of this complaint and incorporate them herein by reference.

24.  Plaintiffs are persons as that term is defined in §1961(3) of Racketeer Influenced and Corrupt Organizations Act ["RICO"] of title 18, United States Code.

25.  Defendants INDYMAC FEDERAL BANK FSB, ONE WEST BANK FSB, are persons as that term is defined in §1961(3) of title 18, United States Code.

26.  At all times relevant to this complaint, defendants INDYMAC FEDERAL BANK FSB, ONE WEST BANK FSB, other individual defendants; ALL PERSONS UNKNOWN CLAIMING ANY LEGAL OR EQUITABLE RIGHT, TITLE, OR OTHER INTEREST IN THE REAL PROPERTY COMMONLY KNOWN AS 11060 BERRYPICK LANE; COLUMBIA, MD 21044, were associated with an "enterprise", as that term is defined in §1961(4) of title 18, United States Code, which was engaged in interstate and foreign commerce and the activities of which affected interstate and foreign commerce. For purposes of this claim, under §1962(c) of title 18, United States Code, the enterprise consisted of an association-in-fact of individuals including, any as yet not ascertained defendants thus associated,

27.   In violation of §1962(c) and §1962(d) of title 18, United States Code, these defendants, and each of them, have engaged in the scheme described in the paragraphs of this complaint which scheme was reasonably calculated to impair unlawfully and/or destroy the lawful economic activity of the plaintiffs as homebuyers seeking to acquire valuable real estate.

28.   The defendants, corporately, and/or individually and/or through other respective fronts and alter egos, engaged in the abovementioned violations of §§1962(c) and (d) of title 18, United States Code, through a pattern of racketeering activity, as that term is defined in §1961(1)(B) and §1961(5) of title 18, United States Code. The racketeering activity in which the defendants engaged in is alleged and set forth in ¶¶ 1 through 17 of this complaint, and also including:

a) Mail fraud in violation of §1341 of title 18, United States Code, in that defendants used the United States mails to pursue their activities;

b) Wire fraud in violation of §1343 of title 18, United States Code, in that defendants used the United States wire facilities to pursue their unlawful activities as above.

29.   The abovementioned acts all occurred after the effective date of the RICO law, and within ten years of each other.

30.   The racketeering activities perpetrated by defendants corporately, individually and/or through other respective fronts and alter egos, were undertaken for the purpose of furthering said defendants' illegal scheme to destroy or impair the lawful economic activities and pursuits of the plaintiffs herein. Each act of the racketeering activity had similar purposes, to misappropriate money and to defraud legitimate homebuyers, and involved the same or similar participants, and had similar results on the same victims, including the plaintiffs.

31.   The abovementioned actions of defendants corporately, and/or individually and/or through other respective fronts and alter egos, violated §1962(c) and (d) as subsections, under title 18, United States Code.

32.   As a directly and proximately caused result of this conduct and activities the plaintiffs incurred damages in the sum of at least $224,000, with the exact amount to be determined at trial according to proof.

33.   Plaintiffs are entitled to all other kinds of damages and calculations of damages provided by §1961 et seq. of title 18, United States Code.

WHEREFORE, the plaintiffs pray for judgment against the defendants, as charged, and each of them, as charged in the causes of action above, as follows:

1)   First Cause of Action:

a)   for general damages of at least $224,000, or the amount of money that plaintiffs actually paid on the loan, including any downpayment, and according to proof;

2)   Second Cause of Action:

a)   for general damages in the sum of at least $224,000, or the amount of money that plaintiffs actually paid on the loan, including any downpayment, with prejudgment interest at lawful rate;

b)   for punitive damages according to proof.

3)   Third Cause of Action:

a)   for general damages in the sum of at least $224,000, or the amount of money that plaintiff actually paid on the loan, including any downpayment with prejudgment interest at lawful rate since at least 10-10-2006;

b)   for a judgment finding the terms of the loan contracts involving plaintiffs substantively and/or procedurally unconscionable and therefore adjudging said loan contracts, including promissory notes and mortgages and security agreements unenforceable;

1          4)    Fourth Cause of Action

2                for complete and itemized accounting of the following:

3                a) all money already received by any defendant from

4     the plaintiffs;

5                b) all assignments, transfers, substitution of parties,

6     on all promissory notes and trust deeds and concerning all other

7     documents and instruments mentioning the property involved in this

8     action.

9          5)    Fifth Cause of Action:

10               a)   for judgment of declaration of the respective future

11    rights or duties as to each of the parties brought under this civil

12    action, as stemming from allegations in this complaint;

13               b)   for judgment that the loan contract,

14    including promissory note and trust deed, are unenforceable against

15    the plaintiffs.

16         6)    The Sixth Cause of Action:

17               a)   for general and special damages of at least

18    the sum of at least $224,000, the exact sum according to proof;

19               b)   for all other calculations of damages permitted under

20    $1961 et seq. of title 18, United States Code ["RICO"].

21

22

23

24

25

26

27

28

1    7)   As to All Causes of Action:

2         a)   for pre-judgement interest at the lawful rate

3  according to proof;

4         b)   for costs of suit incurred herein;

5         c)   for attorney fees as may be appropriate;

6         d)   for such other and further relief as this court may

7  deem just and proper.

8

9  DATED: 3-16-2011.

10                           By:  _W. Dozorsky_____

11                                W. DOZORSKY, J.D., Esq.
                                  Attorney for plaintiff

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT # 1**

**The Housing Bubble and its Collapse**

In good times, U.S. companies tapped China as a bargain basement manufacturing hub, helping lift hundreds of millions of Chinese out of poverty. But China's torrid growth has caused a massive surge in capital to the United States which brought down treasury yields, interest rates and eased the credit terms American financial institutions charged consumers.
National Bureau of Economic Research working paper 15404
http://www.nber.org/papers/w15404
The Giant Pool of Money
http://www.thisamericanlife.org/sites/default/files/355_transcript.pdf )


Greenspan delivers bad news for Fixed-Income Securities investors, good news for domestic borrowers:

**Federal Reserve Board's semiannual monetary policy report to the Congress**
1) Chairman Greenspan presented to the Committee on Financial Services, U.S. House of Representatives July 15, 2003
2) Chairman Greenspan presented identical testimony before the Committee on Banking, Housing, and Urban Affairs, U.S. Senate, on July 16, 2003

He reports: "*When the Federal Open Market Committee (FOMC) met last month, with the economy not yet showing convincing signs of a sustained pickup in growth, and against the backdrop of our concerns about the implications of a possible substantial decline in inflation, we elected to ease policy another quarter-point. The FOMC stands prepared to maintain a highly accommodative stance of policy for as long as needed to promote satisfactory economic performance. In the judgment of the Committee, policy accommodation aimed at raising the growth of output, boosting the utilization of resources, and warding off unwelcome disinflation can be maintained for a considerable period without ultimately stoking inflationary pressures.*"
http://www.federalreserve.gov/boarddocs/hh/2003/july/testimony.htm

In other words, don't expect to make any money investing in US Treasuries for a long time.


The Federal Reserve began lowering its discount rate in 2001 starting that year at 5 ¼%, ending at 1¾%. Coupled with legislation designed to give investment capital managers access to the consumer market, specifically the Gramm–Leach–Bliley Act (GLB) also known as the Financial Services Modernization Act of 1999, for the first time since FDR signed the Glass-Steagal Act of 1933, the lower rates served to fuel an increase in home purchasing and a relaxation of lender requirements. Changes in Fannie Mae and Freddie Mac augmented this situation. Franklin Raines, while Chairman and CEO of Fannie Mae, began a pilot program to issue bank loans to individuals with low to moderate income, and to ease credit requirements on loans that Fannie Mae purchased from banks. Freddie Mac followed suit.

After Chairman Greenspan reported to Congress in 2003 his intention to keep the prime rate low over the long term, large volumes of investment capital began moving to the prime and subprime real estate mortgage industry. In 2004, Fannie Mae and Freddie Mac began offering non-conforming (subprime) loans and reselling them to investment institutions like Lehman Brothers and Merrill Lynch. The demand for mortgages to purchase from the fixed-income securities investors fueled a need for everyone in the real estate mortgage pipeline to relax their lending standards.

Fannie Mae, Freddie Mac and commercial banking institutions would purchase loans from smaller banks and loan brokers then package them, typically hundreds to thousands of mortgages, into "mortgage backed securities" and sell them to Wall Street investment firms. Those firms would then shuffle the mortgages into mixed bags of high and low risk and sell them to the fixed-income securities investors as bonds known as Collateralized Debt Obligations.

"A pool of mortgages, each with a 615 FICO score, performs very differently (and better) than a pool of mortgages where half of the loans with a 550 FICO score and half with a 680 FICO score (for a 615 average)? If you think about it, the 550/680 pool is apt to perform significantly worse, because more of the 550 FICO score loans develop problems. Think about how that got gamed."
-The Big Short by Michael Lewis of Solomon Bros.

Mike Francis, executive director at Morgan Stanley on the residential mortgage trading desk had this to say in the aftermath:
> "It was unbelievable. We almost couldn't produce enough to keep the appetite of the investors happy. More people wanted bonds than we could actually produce. That was our difficult task, was trying to produce enough. They would call and ask "Do you have any more fixed rate? What have you got? What's coming?" From our standpoint it's like, there's a guy out there with a lot of money. We gotta find a way to be his sole provider of bonds to fill his appetite. And his appetite's massive."
> http://www.thisamericanlife.org/sites/default/files/355_transcript.pdf

Loan underwriting requirements relaxed to accommodate the investment industry's appetite, lenders ultimately allowed their brokers to write reckless "NINJA" loans: No Income, No Job, no Assets required. Loan brokers could make any loan because Wall Street was willing to buy it.

Brokers had no exposure, banks had no exposure, the GSEs had no exposure, Wall Street had no exposure as the mortgage made its way up the chain to the ultimate investor. Even investors could guard against exposure by purchasing a "credit default swap" derivative from a firm such as AIG where the derivative seller agrees to cover any losses realized from a mortgage CDO and the investor agrees to pay a quarterly fee for the protection.

# Who knew?

The Bush Administration:  http://georgewbush-
whitehouse.archives.gov/news/releases/2008/10/20081009-10.html

**2001**

- **April:** The Administration's **FY02 budget** declares that the size of Fannie Mae and
  Freddie Mac is "a potential problem," because "financial trouble of a large GSE
  [government sponsored enterprise] could cause strong repercussions in financial
  markets, affecting Federally insured entities and economic activity." (2002 Budget
  Analytic Perspectives, pg. 142)

**2002**

- **May: The Office of Management and Budget (OMB)** calls for the disclosure and
  corporate governance principles contained in the President's 10-point plan for
  corporate responsibility to apply to Fannie Mae and Freddie Mac. (OMB Prompt Letter
  to OFHEO, 5/29/02)

**2003**

- **February: The Office of Federal Housing Enterprise Oversight (OFHEO)** releases a
  report explaining that unexpected problems at a GSE could immediately spread into
  financial sectors beyond the housing market.

- **September: Then-Treasury Secretary John Snow** testifies before the House Financial
  Services Committee to recommend that Congress enact "legislation to create a new
  Federal agency to regulate and supervise the financial activities of our housing-related
  government sponsored enterprises" and set prudent and appropriate minimum capital
  adequacy requirements.

- **September: Then-House Financial Services Committee Ranking Member Barney Frank
  (D-MA)** strongly disagrees with the Administration's assessment, saying "these two
  entities – Fannie Mae and Freddie Mac – are not facing any kind of financial crisis ... The
  more people exaggerate these problems, the more pressure there is on these
  companies, the less we will see in terms of affordable housing." (Stephen Labaton,
  "New Agency Proposed To Oversee Freddie Mac And Fannie Mae," The New York Times,
  9/11/03)

- **October: Senator Thomas Carper (D-DE)** refuses to acknowledge any necessity for GSE
  reforms, saying "if it ain't broke, don't fix it." (Sen. Carper, Hearing of Senate Committee
  on Banking, Housing, and Urban Affairs, 10/16/03)

- **November: Then-Council of the Economic Advisers (CEA) Chairman Greg Mankiw**
  explains that any "legislation to reform GSE regulation should empower the new

regulator with sufficient strength and credibility to reduce systemic risk." To reduce the potential for systemic instability, the regulator would have "broad authority to set both risk-based and minimum capital standards" and "receivership powers necessary to wind down the affairs of a troubled GSE." (N. Gregory Mankiw, Remarks At The Conference Of State Bank Supervisors State Banking Summit And Leadership, 11/6/03)

**2004**

- **February: The President's FY05 Budget** again highlights the risk posed by the explosive growth of the GSEs and their low levels of required capital and calls for creation of a new, world-class regulator: "The Administration has determined that the safety and soundness regulators of the housing GSEs lack sufficient power and stature to meet their responsibilities, and therefore … should be replaced with a new strengthened regulator." (2005 Budget Analytic Perspectives, pg. 83)

- **February: Then-CEA Chairman Mankiw** cautions Congress to "not take [the financial market's] strength for granted." Again, the call from the Administration was to reduce this risk by "ensuring that the housing GSEs are overseen by an effective regulator." (N. Gregory Mankiw, Op-Ed, "Keeping Fannie And Freddie's House In Order," Financial Times, 2/24/04)

- **April: Rep. Frank** ignores the warnings, accusing the Administration of creating an "artificial issue." At a speech to the Mortgage Bankers Association conference, Rep. Frank said "people tend to pay their mortgages. I don't think we are in any remote danger here. This focus on receivership, I think, is intended to create fears that aren't there." ("Frank: GSE Failure A Phony Issue," American Banker, 4/21/04)

- **June: Then-Treasury Deputy Secretary Samuel Bodman** spotlights the risk posed by the GSEs and calls for reform, saying "We do not have a world-class system of supervision of the housing government sponsored enterprises (GSEs), even though the importance of the housing financial system that the GSEs serve demands the best in supervision to ensure the long-term vitality of that system. Therefore, the Administration has called for a new, first class, regulatory supervisor for the three housing GSEs: Fannie Mae, Freddie Mac, and the Federal Home Loan Banking System." **(Samuel Bodman,** House Financial Services Subcommittee on Oversight and Investigations Testimony, 6/16/04)

**2005**

- **April: Then-Secretary Snow** repeats his call for GSE reform, saying "Events that have transpired since I testified before this Committee in 2003 reinforce concerns over the systemic risks posed by the GSEs and further highlight the need for real GSE reform to ensure that our housing finance system remains a strong and vibrant source of funding for expanding homeownership opportunities in America … Half-measures will only exacerbate the risks to our financial system." (Secretary John W. Snow, "Testimony Before The U.S. House Financial Services Committee," 4/13/05)

- **July: Then-Minority Leader Harry Reid** rejects legislation reforming GSEs, "while I favor improving oversight by our federal housing regulators to ensure safety and soundness,

we cannot pass legislation that could limit Americans from owning homes and potentially harm our economy in the process." ("Dems Rip New Fannie Mae Regulatory Measure," United Press International, 7/28/05)

**2007**

- **August: President Bush** emphatically calls on Congress to pass a reform package for Fannie Mae and Freddie Mac, saying "first things first when it comes to those two institutions.  Congress needs to get them reformed, get them streamlined, get them focused, and then I will consider other options."  (President George W. Bush, Press Conference, the White House, 8/9/07)

- **August: Senate Committee on Banking, Housing and Urban Affairs Chairman Christopher Dodd** ignores the President's warnings and calls on him to "immediately reconsider his ill-advised" position.  (Eric Dash, "Fannie Mae's Offer To Help Ease Credit Squeeze Is Rejected, As Critics Complain Of Opportunism," The New York Times, 8/11/07)

- **December: President Bush** again warns Congress of the need to pass legislation reforming GSEs, saying "These institutions provide liquidity in the mortgage market that benefits millions of homeowners, and it is vital they operate safely and operate soundly.  So I've called on Congress to pass legislation that strengthens independent regulation of the GSEs – and ensures they focus on their important housing mission.  The GSE reform bill passed by the House earlier this year is a good start.  But the Senate has not acted.  And the United States Senate needs to pass this legislation soon."  (President George W. Bush, Discusses Housing, the White House, 12/6/07)

**2008**

- **February: Assistant Treasury Secretary David Nason** reiterates the urgency of reforms, saying "A new regulatory structure for the housing GSEs is essential if these entities are to continue to perform their public mission successfully."  (David Nason, Testimony On Reforming GSE Regulation, Senate Committee On Banking, Housing And Urban Affairs, 2/7/08)

- **March: President Bush** calls on Congress to take action and "move forward with reforms on Fannie Mae and Freddie Mac.  They need to continue to modernize the FHA, as well as allow State housing agencies to issue tax-free bonds to homeowners to refinance their mortgages."  (President George W. Bush, Remarks To The Economic Club Of New York, New York, NY, 3/14/08)

- **April: President Bush** urges Congress to pass the much needed legislation and "modernize Fannie Mae and Freddie Mac.  [There are] constructive things Congress can do that will encourage the housing market to correct quickly by ... helping people stay in their homes."  (President George W. Bush, Meeting With Cabinet, the White House, 4/14/08)

- **May: President Bush** issues several pleas to Congress to pass legislation reforming Fannie Mae and Freddie Mac before the situation deteriorates further.

  - o  "Americans are concerned about making their mortgage payments and keeping their homes. Yet Congress has failed to pass legislation I have repeatedly requested to modernize the Federal Housing Administration that will help more families stay in their homes, reform Fannie Mae and Freddie Mac to ensure they focus on their housing mission, and allow state housing agencies to issue tax-free bonds to refinance sub-prime loans." (President George W. Bush, Radio Address, 5/3/08)

  - o  "[T]he government ought to be helping creditworthy people stay in their homes. And one way we can do that – and Congress is making progress on this – is the reform of Fannie Mae and Freddie Mac. That reform will come with a strong, independent regulator." (President George W. Bush, Meeting With The Secretary Of The Treasury, the White House, 5/19/08)

  - o  "Congress needs to pass legislation to modernize the Federal Housing Administration, reform Fannie Mae and Freddie Mac to ensure they focus on their housing mission, and allow State housing agencies to issue tax-free bonds to refinance subprime loans." (President George W. Bush, Radio Address, 5/31/08)

- **June:** As foreclosure rates continued to rise in the first quarter, **the President** once again asks Congress to take the necessary measures to address this challenge, saying "we need to pass legislation to reform Fannie Mae and Freddie Mac." (President George W. Bush, Remarks At Swearing In Ceremony For Secretary Of Housing And Urban Development, Washington, D.C., 6/6/08)

- **July:** Congress heeds the President's call for action and passes reform legislation for Fannie Mae and Freddie Mac as it becomes clear that the institutions are failing.

- **September:** Democrats in Congress forget their previous objections to GSE reforms, as **Senator Dodd** questions "why weren't we doing more, why did we wait almost a year before there were any significant steps taken to try to deal with this problem? ... I have a lot of questions about where was the administration over the last eight years." (Dawn Kopecki, "Fannie Mae, Freddie 'House Of Cards' Prompts Takeover," Bloomberg, 9/9/08)

Armando Falcon: OFHEO
CSPAN footage: http://www.youtube.com/watch?v=_MGT_cSi7Rs
Reported in 4th quarter 2004 the dangers of Fannie Mae and Freddie Mac to the House of
Representatives Government Sponsored Enterprises Subcommittee – Chairman Richard Baker,
Ranking Democrat Barney Frank, Rep. Maxine Waters, Rep. Gregory Meeks, Rep. Ed Royce, Rep.
Lacy Clay, Rep. Christopher Shays, Rep. Artur Davis and Rep. Don Manzullo.

Senator John McCain: Cosponsor **S.190: Federal Housing Enterprise Regulatory Reform Act of
2005**
http://www.postchronicle.com/commentary/article_212173758.shtml

*"This week Fannie Mae's regulator (OFHEO) reported that the company's quarterly reports of
profit growth over the past few years were "illusions deliberately and systematically created"
by the company's senior management, which resulted in a $10.6 billion accounting scandal.*

*The Office of Federal Housing Enterprise Oversight's report goes on to say that Fannie Mae
employees deliberately and intentionally manipulated financial reports to hit earnings targets
in order to trigger bonuses for senior executives. In the case of Franklin Raines, Fannie Mae's
former chief executive officer, OFHEO's report shows that over half of Mr. Raines'
compensation for the 6 years through 2003 was directly tied to meeting earnings targets. The
report of financial misconduct at Fannie Mae echoes the deeply troubling $5 billion profit
restatement at Freddie Mac.*

*The OFHEO report also states that Fannie Mae used its political power to lobby Congress in an
effort to interfere with the regulator's examination of the company's accounting problems.
This report comes some weeks after Freddie Mac paid a record $3.8 million fine in a
settlement with the Federal Election Commission and restated lobbying disclosure reports
from 2004 to 2005. These are entities that have demonstrated over and over again that they
are deeply in need of reform.*

*For years I have been concerned about the regulatory structure that governs Fannie Mae and
Freddie Mac–known as Government-sponsored entities or GSEs–and the sheer magnitude of
these companies and the role they play in the housing market. OFHEO's report this week does
nothing to ease these concerns. In fact, the report does quite the contrary. OFHEO's report
solidifies my view that the GSEs need to be reformed without delay.*

*I join as a cosponsor of the Federal Housing Enterprise Regulatory Reform Act of 2005, S. 190,
to underscore my support for quick passage of GSE regulatory reform legislation. If Congress
does not act, American taxpayers will continue to be exposed to the enormous risk
that Fannie Mae and Freddie Mac pose to the housing market, the overall financial
system, and the economy as a whole. I urge my colleagues to support swift action on this
GSE reform legislation."*

| Contact |

**Buy GOLD if you can and FOOD because you MUST!** eFoodsDirect

Coast to Coast AM - Live Nightly 1am-5am EST / 10pm-2am PST

Home >   > Foreclosuregate

Like  13

## Foreclosuregate

**Date:** 11-14-10
**Host:** Ian Punnett
**Guests:**

Show Audio

Ian Punnett welcomed investigative reporter Greg Hunter, who detailed how foreclosure mills are creating massive amounts of counterfeit promissory notes, so banks could legally foreclose on homeowners. "When you start drilling down on this, you're going to find all kinds of malfeasance," he declared. However, Hunter lamented, unlike the Savings and Loan crisis of the 1980's which saw about 1,000 people sent to jail, the current financial debacle has yet to yield any indictments, despite being forty times bigger. "Not a single person has been charged criminally," he marveled, "with what I think is the biggest fraud in all of history."

Hunter explained that *promissory notes* are a critical aspect of the unfolding Forclosuregate. These notes, he said, are supposed to act as proof that the bank has the right to collect on a mortgage. However, Hunter revealed, as the larger banks purchased mortgages in bundles, many of these promissory notes were lost. Likening the notes to physical dollars, Hunter pointed out that they are "financial instruments," and, thus, cannot be recreated or copied for official use. As such, he cautioned homeowners who are currently paying a mortgage that "you don't know what they're going to say at the end of 15, 20, 30 years of you paying." Along those lines, he shared one troubling tale of a man who paid off his mortgage and was then told that the deed to his home was essentially lost in the mire of the Fannie Mae and Freddie Mac meltdown.

Looking ahead to the future, Hunter warned about what he called "the Fed's biggest fear." He noted that many adjustable rate mortgages will be recast over the next year, resulting in a massive increase in payments for homeowners, peaking in November of 2011. However, the stream of income from the homeowners must continue in order to maintain the economy. Therefore, Hunter theorized that the Fed will take a number of dangerous steps in order to "keep interest rates artificially low until this clears out." This course of action would result in people staying in their homes and still paying their mortgages, but would also "destroy the dollar while you're doing it."

**Website(s):**
usawatchdog.com

## Related Articles

### Deciphering an Old Dog's Trick



In an attempt to design better appliances, physicists have turned to nature in order to learn the secrets of how animals shake themselves dry. Using sophisticated technology, researchers have determined the science behind the process and why it is so successful for mammals of varying sizes. While 'the shake' is particularly potent for larger animals, which have looser skin, the study revealed that tiny creatures using the same technique can generate up to 20 g's of force to accomplish the drying feat. More on the story

## Bumper Music

**Bumper music from Sunday November 14, 2010**

| | | |
|---|---|---|
| 1. Giorgio Moroder | 2. Van Halen | 3. Madness |
| 4. The Clash | 5. Jane's Addiction | 6. David Holmes |
| 7. Naked Eyes | 8. World Party | 9. Talking Heads |
| 10. LL Cool J | 11. Dire Straits | 12. DJ Shadow |
| 13. Aretha Franklin | 14. God Lives Underwater | 15. Flying Lizards |

MP3 Downloads:

You exercise... eat healthy.. and take your medications, so...

**Why Is Your Blood Pressure STILL Out Of Control?**

Discover the little-known reason for your blood pressure problems—and the three-step secret that can make your blood pressure healthy again!

**Click here** for your free report.

**MOODY COMMODITY CENTER**

| | | | | |
|---|---|---|---|---|
| Gold | real time price | $ 1365.40 | ▲ | $ 0.70 |
| Silver | real time price | $ 25.85 | ▼ | $ 0.08 |
| Platinum | real time price | $ 1676.00 | ▼ | $ 2.70 |

Powered by Lear Capital    click here for free info

to receive exclusive daily news and articles in your e-mail box.

Over 20,000 Associates Helping Customers Avoid Foreclosure.

Do You Qualify For A Short Sale ? Find Out In 30 Seconds. Start Now !

Ads by Google

**coasttocoastam**

*39 minutes ago*
Ears Could Make Better Unique IDs Than Fingerprints: New imaging technology shows the potency of ears as identi...

*about 11 hours ago*
Hi folks, this is Tim, filling in for Lex @ the C2C website on Sunday. You can reach me via tim@coasttocoastam.com should any issues arise.

*1:12 PM yesterday*
Polish exorcists gather in Warsaw: Exorcists in Poland are gathering in Warsaw while cases of "Satanic possessi...

*6:23 AM yesterday*
Mountain lion trapped up tree by Jack Russell dog: A Jack Russell chased a terrified mountain lion up a tree...

## Banking Industry

### From the Wall Street Journal:

While home prices didn't peak until some time later, housing activity as measured by new home sales peaked in July 2005. That was also when shares of homebuilders peaked.

A Factiva search of the top 50 newspapers in the U.S. returns 268 stories referring to a housing or real-estate bubble in 2003. In 2004 that number increases to 369 and in 2005 it swells to 1,608. Going month by month in 2005, there's a steady increase in "bubble" stories in the first part of the year, coming to a peak in June.

This isn't to say that reporters somehow "got" the bubble when nobody else did. Reporters' main job is to report, and if they're writing more stories about a housing bubble, it's probably because more people are saying that there is one. Indeed, 81% of respondents in an online WSJ.com poll in May 2005 said they thought the U.S. housing market was in a bubble.
http://blogs.wsj.com/economics/2008/11/18/the-historical-record-on-the-bubble/

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| LIBERATO DeLUMEN, individual and FATIMA DeLUMEN, individual | ONE WEST BANK FSB, as successor in interest to INDYMAC FEDERAL BANK FSB; FEDERAL DEPOSIT INSURANCE CORPORATION; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. et al. |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| W. Dozorsky, J.D., Esq. 2152 Dupont Drive; SUite 214-A Irvine, CA 92612    Tel.: [949] 673-3894 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☑ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☐ No   ☐ MONEY DEMANDED IN COMPLAINT: $ 224,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☑ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service | | | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 444 Welfare | | **SOCIAL SECURITY** |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | **IMMIGRATION** | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety/Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | **FEDERAL TAX SUITS** |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:**   Case Number: **SACV11-699 DOC(ANx)**

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a).  IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☑ No   ☐ Yes
If yes, list case number(s): _____

**VIII(b).  RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☑ No   ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)  ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
            ☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
            ☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
            ☐ D.  Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:**  (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County, State of California | |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County, State of California [doing business there] | |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
   **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | State of Maryland |

* **Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X.  SIGNATURE OF ATTORNEY (OR PRO PER): _M. Nazorsky_     Date  _4-16-2011_

   **Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings
   or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed
   but  is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program.  (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended.  (42 U.S.C. (g)) |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA


### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY


This case has been assigned to District Judge David O. Carter and the assigned discovery Magistrate Judge is Arthur Nakazato.

The case number on all documents filed with the Court should read as follows:

## SACV11- 699 DOC (ANx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.


All discovery related motions should be noticed on the calendar of the Magistrate Judge

=================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [_] Western Division | [X] Southern Division | [_] Eastern Division |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.